This is a default termination case. The contractor is out of business as occurs in a lot of default termination cases. The contract at issue was to provide settlement services for HUD houses that had been foreclosed upon. There's a very large volume of those. They're divided up by states. This was the North Carolina contract. There were two contracts to take care of. What went wrong here? Was it the volume of work that appeared too speedily? From Trust Title's perspective, there were really two overriding things. One, the volume that was given because the contract was delayed for a month or two depending upon how you calculate it and the volume created problems. In addition, there was no excusable delays of any kind granted or considered as you can see in the briefs, this exchange of August 24 and 25. Were there any requested by the client? Yes. Where is that? It's in the August 24, 2010 document. We contend that that's where there was the initial request. There was also a follow-up request. Is that the email that you're talking about? Yes. Can you give us the page number just so we'll all be sure we're talking about the same thing? Are you talking about the email JA34? I believe that's it, Your Honor. It's the August 24 and 25 exchange. There are several places in it. So where is it in this August 24th email that you requested? The contractor says he points out why he's being delayed and he says he needs help and time to do the work, I believe. That's my reading of that document. So that's not what he said. That's what you're reading in this document. There were all sorts of oral discussions that were going on as well. Let's stay with the document. What does the document actually say that leads you to interpret it as being a request? It says that he's having problems because of the lateness in getting going with the job, the fact that he's asking for help from HUD in terms of various forms and other documents that he needs. And then the contracting officer turned around the next day and said no to any of these things. And that was the continual theme, Your Honor, unfortunately. In response to Judge Newman's question, which was similar to one I had when you said what went wrong here, part of it at least is the volume of work. Why didn't you – you had the ability and the authority to decline to take a fairly large number of cases through this period, this critical period, and your client failed to do that. He could have done that and been home free, or perhaps it could have mitigated at least the – why didn't he do what he could have done under the contract, as I understand, and declined to accept a bunch of other cases? There's several reasons, Your Honor. One is he didn't, as we said in our brief in one area, he didn't know exactly what cases he had because there were problems with the data that he was getting from HUD. But in terms of did he have way too many cases beyond the 195 times two limit, absolutely. And he was in the first stages of contract performance. The contracting officer was pressing him for settlements. There were a lot of reasons to do those settlements, and he accommodated them. But your staff was supposed to be up to speed from day one. There were a bunch of people that supposedly had been hired and were going to be on board, and yet they never showed up. How do you deal with that? With respect, Your Honor, I don't think that's the government's position. I don't think that's correct, and I think in our reply brief we tried to answer those issues. The contract was delayed for a month. It could have been delayed for three months because it was a protest, because it was a GAO protest. If it had been delayed for three months, the contractor went back out and he told people that he'd hired, and he told the real estate people where he had the two offices, he says, we have to do something different here. So he was prepared to perform but for the protest, and we pointed that out in our briefs. Once the protest ended prematurely, which is good, I suppose, in 30 days, then he went and got moving, and within a week to two weeks he had things in place and he was working. Were there different people that he was using? Absolutely, because the people had gone. They'd gone on to other jobs. They weren't going to wait for a month or two or three. Can you go back to my question about why he didn't decline to take the application? I didn't understand your answer. If at some point didn't he know he was overwhelmed by the number, he was having a problem, and therefore we charge him with knowing what his rights are under the contract, and why didn't he just say, okay, let's hold this additional amount, which he had authority to do under the contract, so that he could have some time to catch up and repair it. Didn't he have complete authority to do that, and I don't understand why he didn't. Your Honor, he did. He could have done that. I'm agreeing with you. But he didn't do that. So what's the consequences of that, and who created that problem? The government created that problem. Well, obviously he created it. If he had the authority to say, don't give me these extra cases, and he got these extra cases, and they at least compounded the problem, why isn't the onus on him? I think it's a mutual thing, Your Honor. And I think the most important point that I have is… Even though we expect him to say, okay, I can't do this, I don't want to take these 200 extra cases, the government should have denied him those cases or not even tried to send them to him? I don't understand why… Right. And that's exactly what they did with the re-procurement contractors. They had another program, a buyer select program, where they could place them elsewhere. I'm saying the contractor made a mistake in admitting that. I mean, he certainly did, and he said that in his testimony at trial. With perfect 20-20 hindsight, we shouldn't have taken these on. But we did take them on, and we got into it, and we got no help, and we got no extra time. Why is it a matter of hindsight? I mean, this all happened within a fairly short period of time. So it wasn't like a year later when he looks back on it, he could figure out that he was overloaded. He knew every day from the time this contract started that there was a problem, and it was getting worse rather than better. So I don't understand why you say in hindsight he acknowledges that he could have not taken the cases and maybe survived. Well, you have to view in context this contract. It was 90 days. It was to be a three-year contract. It was terminated for default in 90 days. Within the first, let's assume performance started on August the 7th, although there's some debate about that. Here he is on August the 24th writing to the government and saying, we've got terrible problems here, and we need your help in this email exchange. We can keep talking about the email, but I don't see where it says, so maybe you can show me where it says we have terrible problems and we need your help. I'm looking at if we're talking about the same email. We are talking about the same email, Your Honor. Where is it in there? With respect, you need to read the government's response, too, which is none of these delays. Well, you didn't tell me about the government. You said that's what he said, we've got terrible problems. Where do you glean from the email that would draw that conclusion? I'm sorry, Your Honor, but that's the way I read the email that he's asking. In the government contract area, you don't tell the government necessarily something terrible in terms of the world is coming to an end. He was trying to be professional about what he said and that he needed help. He needed help. And the next day, the government says, none of these delays qualify. None of these delays, none of these situations qualify for any excusable delay. And where is the government email? It's in the briefs and the appendix is right behind it. It's in the chain. It looked from the record as if the government put a lot of weight on the delay in forwarding the proceeds when they were received. Is that correct? Yes, and that's a separate... To me, this case is divided into two parts. The first part is the fact that there was a 30-day delay or more from the protest and the contractor had at least 30 days to do his first settlements. It says that in his proposal. It says that in the contract. It says that in HUD's contract, it's 45 days. The contracting officer wanted instant performance. This is what threw everything off. He never recovered from that situation. And he only had three months to recover from it. After the first month and a half, it was sunk. There's no doubt. I mean, he was sunk. Well, wasn't he sunk by not having an attorney on staff? Your Honor, he had made provisions to get attorneys. He had attorneys signed up originally to do it. And the delay caused him to lose those people. Is that really true? Is that really what the record reveals? Yes. I thought he had some notion that he could get attorneys to do it for free in exchange for further cases, and that that never came to fruition. I'm not clear on... Maybe you're right, but I didn't know that that was a result, that losing the attorney's assistance was attributable to the 30-day delay. Is that in the record? Is that established? Is that a finding that the court made? Where is that? It was in testimony at the trial below, what he had done, Mr. Garner's testimony. And the testimony also said or hinted that there was some sort of, I used the word conspiracy, but that the local lawyers were not interested in the arrangement that he was proposing. I think the local bar, I mean, I think there's a number of things in the record. The local bar was not happy about a title company doing this work. And that's what had happened before that the company didn't know about in the 2005 to 2010 contract was started out as a title company. And then the government, the HUD said, you know, you're going to be terminated for default if you don't become a law firm. You have to go make yourself into a law firm, which they did. The predecessor contract. This was not a company that was new to the title business. Is that right? That's correct. They were new to the government business, but they had done a great deal of commercial work. Had they done that work in North Carolina? They had done some work in North Carolina. So they knew that an attorney was required. Well, they knew an attorney was required to review, just like in lots of states, is required to review some of the documents, but not to do the clerical, you know, paper pushing stuff, which is what drives the price up if you have lawyers doing that. This contract would be $225 a unit, which is a good deal less than what people pay, you know, when they go to settlements one at a time. There were going to be several thousand settlements. Okay. Why don't we hear from the government? Why don't we, you want to say your name? Yes, thank you, Your Honor. Help me out with your name. Eric Loft Griffin for the United States. May it please the Court. Trust titles post-trial appeal should be denied because they fail to identify any legal error in the trial court's decision. After a six-day trial with over ten witnesses, hundreds of exhibits, and, you know, in six days of trial, the trial court sustained the default termination of trust title on two independent grounds. The first ground was trust title's failure to make progress in closing the cases it was assigned so as to endanger the performance of the contract. And the second independent basis for the termination was trust title's repeated failure to comply with the contractual covenant to wire funds from the sales proceeds by no later than 2 p.m. the next business day. Wasn't it, doesn't the record show that that compliance was like 3% or some such number? Yes, trust title understood from the solicitation that 100% compliance was expected for this requirement, and trust title failed to meet this requirement in virtually every single case that it closed. Let's assume hypothetically that there's a situation in which somebody's got all their employees hired and everybody's ready to go, and then, in this case, there's a protest, and therefore there's a delay. So the contractor becomes unable to perform at the get-go because of that. He loses the employees that he was supposed to retain, etc. What would a normal, what would a person do in the government's view to try to remedy that or to avoid default in those circumstances? In this case, the contract provided the contractor with a very specific remedy, and that's to request, in writing, an equitable adjustment in time or money specifying what additional cost resulted from the delay and what additional time it needed to perform the contract. In your view, did the contractor in this case ever do that? No, the contractor didn't do it, and it was admitted, and the trial court agreed and found that the contractor did not assert its right under the contract. What about these emails that we've been referring to? The emails don't express any sort of indication of, we need X amount of time or we need X amount of money in order to successfully perform the contract. And with respect to the amount, the volume, it doesn't indicate any sort of notification to the contracting officer that it was declined to refuse any of the assignments. So, unless the court has further questions, we rest on our briefs and respectfully request that the trial court's judgment be affirmed. Thank you. Thank you. I want to respond on the issue of the compensable delay versus excusable delay, because I think there's confusion about that, and I think the trial court was confused about that. I agree with Mr. Lofgraven. We had a long trial. There was times when it was contentious. The trial judge was fair and even-handed. There's absolutely no complaint about that. The only objection that we have, the only real objection is we think he made a legal error on the issue of excusable delay. And that is, all of these things that the court's been asking questions about, that we've been talking about, those are excusable delay kinds of issues. The contracting officer did not do... Where do you assert, make that assertion? Where does your client make that assertion in writing? Your Honor, I think we made it in the 24 and 25 exchange, and also in the 14th. There's a later one in the 14th. Read me the language from J3435 where that assertion is made. I don't have it in front of me, Your Honor. It's in your appendix.  But I think it is what it is. I mean, in terms of what the... I can't characterize it other than say, those are the two things we rely upon. But here's the one point that I think is being missed, and that is, excusable delay is something in the default clause that you don't have to give a written notice for. Indeed, the contracting officer under Darwin and Lisbon has an obligation to co-make those assessments themselves. Is this contractor excusably delayed? Not that he's entitled to more money, but do these events give rise to an excusable delay so that I should not default terminate this contract? I should give him more time? The issue here, the re-procurement cost, the remedy that you're seeking, relates to the cost of the re-procurement? The trial judge upset the re-procurement, Your Honor, below. And there are no re-procurement costs left. Those were upset. What we're seeking is a termination for convenience so we can get paid some of the costs that we expended on the job. But the re-procurement cost thing was upset by the trial judge for dissimilarity. But I think the excusable delay point is important. I think that in addition to telling the government what we think we told them in the 2425 exchange and the 14 exchange, that the contracting officer under Darwin and Lisbon, this being a failure to make progress case, had an obligation to go make her own assessment of those issues. She decided from the 25th on, no excusable delays from any source at all. And that's not what the FAR regulations call for in a default investigation as considered in the Darwin case, and it's not appropriate and it's not fair either, Your Honor. Thank you. Thank you, Mr. Felton. So the case was submitted.